ORIGINAL

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 2 3 2020 ★

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DERRIN DYSON
    Petitioner,

    -against-

SUPERINTENDENT THOMS
    Respondent,

BROOKLYN OFFICE
WRIT OF HABEAS CORPUS



RECEIVED
APR 2 3 2020
PRO SE OFFICE

\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
WRIT OF HABEAS CORPUS
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Submitted by

Derrin Dyson 15A3359
Five Points C.F.
P.O. Box 119
Romulus, N.Y. 14541

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................. i

PROCEDURAL HISTORY .................................... 1

STATEMENT OF FACTS .................................... 2

THE MOLINEUX HEARING ................................. 3

THE PEOPLE'S CASE AT TRIAL .......................... 5

THE VOIR DIRE REGARDING THE DNA EVIDENCE ............ 10

HINDEL'S TRIAL TESTIMONY ............................ 13

THE DEFENSE CASE .................................... 14

THE VERDICT ......................................... 15

POINT I ............................................. 16

    The Court's Molineux ruling, allowing the People to
introduce proof of Petitioner's involvement in two
other burglaries, deprived him of a fair trial, because
there was nothing unique about the way in which the
burglaries were effectuated.

POINT II ............................................ 25

    Petitioner was denied his Sixth Amendment Right to
confront the witnesses against him when the People
submitted DNA evidence - critical proof against him
at trial - through a witness who did not conduct
the DNA testing and merely echoed the conclusions
reached by another criminalist.

CONCLUSION .......................................... 31

## PRELIMINARY STATEMENT

This is a memorandum of law being submitted in support of the application of a Writ of Habeas Corpus, where the Petitioner most respectfully challenges his present confinement. Petitioner has forwarded under separate cover copies of the exhibits referred to in this memorandum of law for the Court's review and consideration herein.

## PROCEDURAL HISTORY

Petitioner is incarcerated pursuant to a judgement of the Supreme Court of the State of New York, Kings County (Tomei, J., at trial and sentencing) rendered on November 12, 2015, convicting him, after a bench trial, of First Degree Criminal Sexual Act [P.L. § 130.50(1)], First Degree Sexual Abuse [P.L. § 130.65(1)], two counts of First Degree Burglary [P.L. § 140.30(1)(3)], two counts of First Degree Robbery (armed with a deadly weapon)[P.L. § 160.15(2), two counts of First Degree robbery (use or threatened use of dangerous instrument)[P.L. § 160.15(3)], two counts of Second Degree Criminal Possession of a weapon [P.L. § 135.03(1), (3)], two counts of First Degree unlawful imprisonment [P.L. § 135.10], and two counts of Fifth Degree Criminal Possession of Stolen property [P.L. § 165.40], and sentencing him to concurrent terms aggregating 15 years in prison.

Petitioner appealed to the Appellate Division Second Department, and on February 20, 2019 said appeal was affirmed (People v Dyson, 169 A.D.3d 917). Petitioner then filed an Application for Leave to the Court of Appeals, and on April 15, 2019 (People v Dyson, 33 N.Y.d 975).

## STATEMENT OF FACTS

Introduction

Appellant was charged in a thirty-seven count indictment with first-degree criminal sexual act, first-degree robbery, first-degree burglary, second-degree criminal weapon possession, and lesser counts, based on an incident in which he and three accomplices allegedly broke into an apartment.

Over objection, the court permitted the People to introduce evidence that appellant had committed two burglaries with accomplices about a month before and a month after the instant offense. The prosecutor claimed, and the court agreed, that the crimes involved a unique *modus operandi* (M.O.): accessing the roof of one of the participant's buildings, hopping over a few rooftops, and then entering the top floor of another building.

At appellant's bench trial, one of the primary pieces of evidence against him was a pair of pants with his semen on them that an accomplice said appellant had been wearing during the incident. A supervisor from the Office of the Chief Medical Examiner (OCME) testified, over defense counsel's objection on Confrontation Clause grounds, that appellant's buccal swab sample matched the DNA profile generated from semen stains on the pants. The analyst acknowledged, however, that he had not personally conducted,

observed, or supervised the testing, and that he merely reviewed conclusions reached by another criminalist.

Appellant and his mother testified that appellant had been home during the incident.

## The *Molineux* Hearing

The prosecutor sought to introduce evidence of two burglaries that occurred around the time of the present incident, to which appellant had already pled guilty. The People contended that these crimes involved the same *modus operandi* (M.O.) as this case, specifically "climbing over rooftops to get into apartments" (15, 18-20, 22-24, 31).[1]

The prosecutor alleged that, here, on January 30, 2012, appellant and his three codefendants, Christopher Scott, Dezhuan Samuels, and Christopher Francis (a juvenile), all members of the Brower Boys street gang, went to Scott's rooftop wearing gloves and ski masks and armed with guns, jumped over several buildings, and accessed the interior of 543 Madison Street through the rooftop (8-10, 15, 43). They entered an apartment, tied up the occupants, orally sodomized the woman, and burglarized the place (8-14).

According to the prosecutor, appellant committed a similar crime on December 25, 2011 when he, Samuels, and a third person went to Samuels's

---

[1] Numbers without prefix refer to the minutes of the trial.

3

rooftop at 921 St. Mark's Avenue, crossed over a few buildings, and entered 917 St. Mark's Avenue through the fire escape (18-22, 24, 35-36). They ransacked several apartments while wearing gloves, stealing electronic equipment and a rifle (20-21). The prosecutor conceded that appellant and his cohorts were not wearing masks during this incident, but later said that, after reviewing surveillance footage, he believed that they were (20, 35-36, 42-43).

Likewise, while appellant was out on bail for the instant offense, along with two accomplices, on March 2, 2012, he burglarized a top floor apartment in a different building, again accessing it via the roof and using gloves during commission of the crime (27-29). He and his codefendants were caught in the act and on video camera because the burglary larceny apprehension and surveillance team (BLAST) of the NYPD had been following appellant (27-30).

Explaining that these crimes were "similar to what Brower Boys were doing with the burglaries and Crown Heights" the prosecutor argued that the M.O. was unique, distinctive, and the same because all incidents involved use of "a co-defendant's residence to gain access to the roof" (8, 15-16, 23-25, 27-28, 31).

Defense counsel argued that this was simply propensity evidence – the People wanted the Court to conclude that appellant was a "bad guy" (31-35).

Observing that there was nothing unique about the M.O. of the three burglaries as they merely involved going up on rooftops, crossing over, and "stealing stuff," which "happens all the time," defense counsel contended that, in actuality, the instant offense was dissimilar because it involved a sexual assault, in contrast to the crimes to which appellant had pled guilty (32-33, 35).

The court held that the People could use evidence of the two other burglaries to demonstrate a common M.O. and thereby prove identity (44).

## The People's Case at Trial

The People introduced surveillance footage and stipulations, and elicited testimony, establishing that appellant had committed and pled guilty to the December 25, 2011 and March 2, 2012 burglaries that were the subject of the *Molineux* hearing, and that Dezhuan Samuels had pled guilty to the instant crime as well as the December 25 burglary (Detective Michael Rodrigues: 785-96, 807, 812-13; Detective Arthur Umlauf [BLAST]: 858-60, 862, 865, 869-72, 876-77, 881-83; Stipulations: 1026-28; Peo. Exs. 28, 38, 43, 44).

Around 12:30 p.m. on January 30, 2012, 22-year-olds Corinne Daniel and Joey DeJesus, roommates and recent graduates of Oberlin College, were in separate bedrooms of their top-floor, three bedroom apartment at 543 Madison Street in Bedford-Stuyvesant; their other roommate was not home (Detective

Marc Brown [Crime Scene Unit]:60-62; Police Officer Kim Thy: 88-90; Detective Nurca Quinones: 105-06; DeJesus: 889-94, 928-29; Detective Hector Bruno: 937; Daniel: 960–62; Lieutenant Russell Burghard: 1014-15).   Four masked and gloved black men, armed with guns, entered their apartment through the unlocked front door (DeJesus: 894-96, 929; Daniel: 962-66, 989-91).

The men brought DeJesus into the bathroom, laid him down on the floor, bound his hands behind his back and blindfolded him, and tied Daniel up in her room and blindfolded her after briefly bringing her to the bathroom (DeJesus: 896-902; Daniel: 965-70, 977).   Demanding Daniel and DeJesus's money and debit cards and PIN numbers, putting guns to their heads and running knives over their bodies, the men threatened to kill them if the numbers were not correct or their roommate returned (DeJesus: 901, 903-08, 915; Daniel: 966, 968-71, 999).   At one point, a man put a gun in DeJesus's mouth, telling him it was a .22, and describing what would happen if he fired it (903).   Throughout this time, one of the men left the apartment several times and returned, stating the first couple of times that he could not get the ATM cards to work, before coming back a third or fourth time and saying that he was finally able to get some cash (DeJesus: 905-08; Daniel: 970-71, 976-77, 980, 982, 990–91, 996, 1002).

6

In the meantime, while being threatened with a gun and a knife, Daniel was groped and forced to perform oral sex several times, although she was unsure on exactly how many men (DeJesus: 908-10; Daniel: 970–84, 991-1004).   At some point she was moved to DeJesus's room and one of the men ripped her shirt open so that her breasts were exposed (DeJesus: 902, 918-19; Daniel: 977, 982-84).   Before leaving, the men again threatened to kill Daniel and DeJesus, especially if they called the police (DeJesus: 911-15; Daniel: 982-84).   The apartment had been ransacked and they were missing their laptops, cell phones, some cash, and DeJesus's silver Movado watch; $1000 had also been withdrawn from Daniel's account (DeJesus: 901, 920, 928, 930-32; Daniel: 985-86, 988).

Although DeJesus and Daniel could not identify appellant or any of the other assailants, Christopher Scott, a friend of appellant's, testified pursuant to a cooperation agreement guaranteeing a seven-year prison sentence that he, appellant, Samuels (who had a loaded gun), and Francis, went to Scott's rooftop terrace, jumped over a few buildings, and entered a top floor apartment of the last building on Madison Street (143-45, 654-60, 676-79, 683-84, 692-99, 708-10, 713-15).   Detectives connected Scott to the crime when they realized that surveillance cameras in his building had been turned off during the incident (Quinones: 106, 109-11, 115-18; Scott: 672-73; Burghard: 1016-17).

Scott's description of the events inside the apartment was generally consistent with the complainants', although he claimed that he alone of the four men did not sexually assault Daniel because he had "morals and principles" (660-69, 685-86, 699-705, 717, 720-21).   On cross-examination, defense counsel inquired about Scott's statement to police that only Francis and Samuels sodomized Daniel (687-91).   Scott denied making the statement, but Detective Bruno recalled Scott saying "something like that" (Scott: 688-91; Bruno: 956-57).

Around 2:00 p.m. on the day of the incident, the men – including appellant – took electronic equipment they had stolen from DeJesus and Daniel to a nearby deli and tried to sell it to the owner, Abdo Alqotaini (Scott: 670-72; Alqotaini: 823-29, 834-35, 842-44, 848; Bruno: 947-49; Daniel: 988). Although Alqotaini initially declined, a "kid" of about sixteen years old soon returned with the items, saying that appellant had sent him, and Alqotaini purchased them at the request of one of his employees (Alqotaini: 827-32, 836-46).

Detectives searched Scott's mother's apartment on February 2, 2012, where they discovered a loaded and operable .22 revolver in the stove, which Scott said had been used in commission of the crime (Quinones: 124-29; Scott: 673-75, 684-85, 705-06, 718-20; Detective Desmond Stokes [Firearms

Analysis]: 726, 732-39; Bruno: 940-41; Burghard: 1018-21; Peo. Ex. 10). The police also found Adidas pants which, according to Scott, appellant had worn during the incident but left with Scott afterward (Scott: 669-70; Bruno: 941-43, 950-51). The police later found DeJesus's watch in appellant's apartment (DeJesus 930-33; Bruno: 944-46; Burghard: 1021-22).

The People introduced into evidence several screenshots of appellant's Facebook posts and photographs, some of which depicted him displaying gang signs, using gain slogans, and wearing a ski mask (Scott: 681-82; Rodrigues: 754, 761-63, 766-69; Peo. Exs. 22, 23). During the very early morning hours on the day of the incident, appellant had written on his Facebook page "Brakein daii On Dah ave..." (Rodrigues: 776-79; Peo. Ex. 25). Around 9:30 a.m., appellant wrote "nikkas ain't getting it how we get it" (Rodrigues: 779-80; Peo. Ex. 26). Later on that day, appellant posted a photograph depicting hundreds of dollars in cash and what appeared to be marijuana, below which he had written "I'm Gettin it..." (Rodrigues: 781-83; Peo. Ex. 27). The time at which this post was created could not be determined because it was a mobile upload, but the People established that several comments were posted around 11:00 p.m., which suggested that the photograph and caption were posted shortly before that time (Rodrigues: 784-85, 813-14; Peo. Ex. 27).

The *Voir Dire* Regarding the DNA Evidence

The DNA evidence was introduced through the testimony of Robert Hindel, a supervisor and Criminalist Level 4 at the Office of the Chief Medical Examiner (OCME) (147-48). During a *voir dire* of the witness, defense counsel asked whether he would be testifying about "DNA analysis or tests that you, yourself, have conducted or will you be testifying with regard to work by others...?" (156). Hindel answered that he would be testifying "to work done by others" "generally, not in my presence" (156).

When defense counsel asked Hindel if he prepared any of the reports pertaining to the DNA evidence, Hindel replied, "[n]o, I was the analyst who signed the reports [] under my supervision, so when she completed the report, I did a technical review of the case file" (175). The following colloquy ensued:

> [DEFENSE COUNSEL]: What I am getting at: You did not perform any of the numerous steps that lead up to the . . . extraction, quantitation [*sic*], amplification and separation, you yourself did not do that?
>
> THE COURT: All he did was review the technical finding of the person who did the test.
>
> [DEFENSE COUNSEL]: Is that correct?
>
> [HINDEL]: Yes (175).

In response to defense counsel's question, Hindel also agreed that if the various

steps of DNA testing were conducted incorrectly, the ultimate finding would be "skew[ed] or affect[ed]" (175-76).

The court asked Hindel if he "perform[ed] any of the tests" resulting in the evidence the prosecutor was seeking to introduce and Hindel said "[n]o" (176). When the court asked if it was "your position that what you did was review the work of a criminalist or technician," Hindel answered that the testing was not done by a single person and that:

> the analyst who signs the report will collect all the information. She did some of these evidence examinations, she may have done some of the DNA testing work . . . she collects all the data that was generated by other people from that work then she writes her report based on that (176-177).

At that point, Hindel said "I do technical review of the report she wrote" (178).

Hindel responded affirmatively to defense counsel's question whether criminalist Lisa Mokleby "signed or made most if not all of the conclusions," and Hindel added that Mokleby wrote the DNA reports (178). The exhibits pertaining to this material identify "LMO" and "Lisa Mokleby" (presumably the same criminalist) as the analyst reaching the conclusion that appellant's DNA matched the results from the Adidas pants. "MJS" was listed as the supervisor. The initials "RH" do not appear anywhere (Peo. Ex. 14).

Hindel acknowledged that OCME received a police report along with the

11

items to be tested and that "we know basic facts. We received complaint reports" (178-79). The exhibits related to the DNA evidence contained copies of police reports describing the crime as a robbery and sexual assault (Peo. Exs. 13-17). During cross-examination, Hindel conveyed his belief that there had been allegations of oral sodomy and vaginal sex in this case (648).

After this *voir dire*, defense counsel lodged the following objection to Hindel's testimony:

> I anticipate the People are going to ask this witness who did not personally conduct or witness any of these procedures being performed ... My client, under confrontation clause [sic] . . . it is his right to confront any expert or any other statistician or criminalist from OCME who is going to be putting forth opinions or conclusions, not just someone, like Mr. Hindel, with all respect to him. . . I cannot cross-examine a piece of paper with respect to the validity.

> \*\*\*

> People are going to offer evidence against my client ... which bear opinions and conclusions of someone who apparently analyzed something, who I am not going to be allowed to cross[-]examine with respect to the validity or the weight of any those findings should be accorded [sic] . . . . I want to be able to ask questions of the person who actually arrived at these opinions and conclusions, linking my client to DNA recovered from any of the seized property. I want to be able to challenge that person's findings. I want to be able to challenge that person's findings, how he or she arrived at those findings, whether they should be accepted by this Court and what weight if any they should be given by this Court (182-84).

When the court cited *People v. Brown*, [13 N.Y.3d 332 (2009)], defense counsel maintained that he should be able to cross-examine Mokleby under the Confrontation Clause (184-87). Acknowledging that defense counsel made a "good argument," the court permitted Hindel to testify (187).

During a break in Hindel's direct examination, defense counsel renewed his objection to this testimony, asserting that, while *Brown* permitted the review of raw data, Mokleby's opinions and conclusions ought to be precluded under that case and other controlling law (602-03). The court adhered to its former ruling (603-04). Defense counsel reiterated his objection to Hindel testifying about Mokleby's conclusions several more times (606-07, 619-20).

Hindel's Trial Testimony

Reviewing Mokleby's findings from the reports, Hindel determined that the Adidas pants contained several semen stains from which a DNA profile was developed (Hindel: 174-78, 197-200, 606-08, 610, 621-22, 640-41; Peo. Ex. 14). There was no way to determine when the semen had been deposited (647-48). Again, using the reports, Hindel compared the profiles developed from the stains to one derived from appellant's buccal swab sample, which he had consented to providing, and determined that they matched (Hindel: 617, 620-23,

13

640-41, 645; Henry: 817-19, 1079-80; Stipulation: 1024; Peo. Ex. 14).

Hindel's laboratory had determined, as encapsulated in Mokleby's report, that the DNA profile from two stains "would be expected to be found in approximately one in greater than 6.8 trillion people," so on 1,000 planet earths, this profile would be found only once (623, 625, 645-47; Peo. Ex. 14 [File 2, 8/21/2012 Laboratory Report at 3-5]). The profile created from another stain would be found in one of about 179 million people (623-24; Peo. Ex. 14 [File 2, 8/21/2012 Laboratory Report at 3-5]). On this basis, Hindel concluded that the semen belonged to appellant (624-25, 645; Peo. Ex. 14 [File 1, 8/23/2012 Laboratory Report at 3-4].[2]

### The Defense Case

Appellant, <u>Derrin Dyson</u>, and his mother, <u>Linda Dyson</u>, testified that he stayed home from school on January 30, 2012 (Linda: 1031-34, 1036, 1041-43; Derrin: 1046, 1056, 1060).[3] According to Linda, appellant's girlfriend Rashida came over after school, around 3:30 p.m. (Linda: 1031-34). Appellant said that he left to pick Rashida up at about 2:30 or 3:30 p.m., and then went to the park,

---

[2] Francis's semen was also found on clothing and bedding from Daniel and DeJesus's apartment while Samuels's and Scott's DNA was not found anywhere (Thy: 93-95; Hindel: 173, 200-03, 611, 613-14, 621-22, 627-32, 634-35; Peo. Exs. 15-17). The Adidas pants also had DNA from an unknown female, who was not Daniel (Hindel: 641-44, 647-48).

[3] Appellant and his mother will be referred to by their first names to avoid confusion.

where he encountered Scott, Samuels, and Francis, at which time Francis sold him the Movado watch (Derrin: 1054-57, 1060-62, 1065). Acknowledging that he was friends with Scott, Samuels, and various other Brower Boys, and that he had committed the two burglaries that were the subject of the *Molineux* hearing, appellant maintained his innocence of the instant crime (1045-51, 1053-55, 1062-66).

During his own cross-examination, appellant denied making a statement to the police, elicited on rebuttal through Detective Henry, that he was with Scott, Samuels, and Francis the morning of January 30, but then fell ill and took a cab home around 10:15 a.m. (Derrin: 1055-56; Henry: 1072-79; Peo. Ex. 47). In the alleged statement, as at trial, appellant said that he had nothing to do with the incident (Derrin: 1055-56; Henry: 1072-79; Peo. Ex. 47).

### The Verdict

The court found appellant guilty of first-degree criminal sexual act, two counts of first-degree burglary, four counts of first-degree robbery, two counts of second-degree robbery, two counts of second-degree criminal weapon possession, first-degree sexual abuse, two counts of first-degree unlawful imprisonment, and two counts of fifth-degree criminal possession of stolen property (1136-39). It acquitted appellant of three other counts of first-degree

criminal sexual act, and five counts of first-degree sexual abuse (1137-38).

## ARGUMENT

## POINT I

THE COURT'S *MOLINEUX* RULING, ALLOWING THE PEOPLE TO INTRODUCE PROOF OF APPELLANT'S INVOLVEMENT IN TWO OTHER BURGLARIES, DEPRIVED HIM OF A FAIR TRIAL, BECAUSE THERE WAS NOTHING UNIQUE ABOUT THE WAY IN WHICH THE BURGLARIES WERE EFFECTUATED.

Over defense counsel's objection, the court permitted the prosecutor to introduce evidence that appellant had committed two burglaries before and after the instant crime to prove identity based on a purportedly unique *modus operandi* (M.O.): accessing one of the perpetrators' rooftops, jumping over a few buildings, entering the top floor through the roof or fire escape, and burglarizing a unit or units therein. There was, however, nothing distinct or idiosyncratic about this methodology, undoubtedly a common means of burglarizing apartments in a dense urban area such as Brooklyn. Moreover, the present offense was critically different because it, unlike the other two, involved a sexual assault. Accordingly, the court erred when it deemed this material admissible and appellant was deprived of a fair trial. U.S. Const., Amends. V,

16

XIV; N.Y. Const., Art. I, § 6; *People v. Ventimiglia*, 52 N.Y.2d 350, 359 (1981); *People v. Molineux*, 168 N.Y. 264 (1901).

"[A] criminal case should be tried on the facts and not on the basis of a defendant's propensity to commit the crime charged." *People v. Rojas*, 97 N.Y.2d 32, 36 (2001); *see People v. Gillyard*, 13 N.Y.3d 351, 355 (2009). It has long been the rule in New York that evidence of a defendant's prior crimes is generally inadmissible at trial, as "propensity evidence invites a jury to misfocus, if not base its verdict, on a defendant's prior crimes rather than on the evidence-or lack of evidence-relating to the case before it." *Rojas*, 97 N.Y.2d at 36-37; *see also Gillyard*, 13 N.Y.2d at 355; *People v. Beam*, 57 N.Y.2d 241, 250 (1982); *Molineux*, 168 N.Y. at 313.

The rule "is based on policy and not on logic," *People v. Allweiss*, 48 N.Y.2d 40, 46 (1979), because while "[i]t may be logical to conclude from the defendant's prior crimes that he is inclined to act criminally," such evidence is excluded to prevent a conviction based on collateral matters or because of a defendant's criminal history.   *People v. Arafet*, 13 N.Y.3d 460, 465 (2009). *See People v. Sharp*, 107 N.Y. 427, 467 (1887) ("the general rule is that when a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary

circumstances, proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded").

There are exceptions to this rule: evidence of prior crimes can be admitted when relevant to prove, *inter alia,* identity based on a unique M.O. *See Molineux,* 168 N.Y. at 294–316; *accord Gillyard,* 13 N.Y.2d at 351; *People v. Alvino,* 71 N.Y.2d 233, 241-42 (1987).   This particular exception is only applicable when identity is contested in the case.  *See People v. Agina,* 18 N.Y.3d 600, 604 (2012).   To overcome the inevitable prejudice that results from admitting evidence of other crimes, the M.O. must be so unusual that the only logical conclusion to be reached is that the defendant committed both or all crimes.  *See Beam,* 57 N.Y.2d at 252; *People v. Condon,* 26 N.Y.2d 139, 142 (1970).

> The mere fact that similar crimes were committed in a similar manner [does] not particularly aid in identifying the defendant <u>unless the similarities were unusual enough to compel the inference that the defendant committed both</u>. Thus the defendant's *modus operandi* must be sufficiently unique to make the evidence of the uncharged crimes "probative of the fact that he committed the one charged."

*Beam,* 57 N.Y.2d at 251 (emphasis added), *quoting Condon,* 26 N.Y.2d at 144, *Alweiss,* 48 N.Y. at 47-48.  *See People v. Wright,* 121 A.D.3d 924, 926 (2d Dept. 2014) ("the identity exception to the *Molineux* rule is used in limited

circumstances, when the defendant employs some unique, unusual, or distinctive *modus operandi* in an uncharged crime that is relevant to proving his identity as the perpetrator of the crime charged"; internal citations and quotation marks omitted); *People v. Johnson*, 114 A.D.2d 210, 212-13 (1st Dept. 1986) (to qualify as a *Molineux* identity exception based on a unique M.O., a defendant's method must have a "concurrence of common features" or be characterized by "distinguishing oddities").

Here, the admission of evidence of appellant's involvement in the two other burglaries was error, because there was no feature both common and unique to all three incidents. Merely accessing buildings by going to the roof of one, jumping over some rooftops, and entering another apartment building through the roof door or fire escape is hardly an unusual or peculiar method, particularly in a densely populated area like Brooklyn, where buildings are almost exclusively close together. Plainly, that is one of only a couple means of entering a building without a key, the alternatives being through the front door or by ascending a fire escape. Nor did the burglars' donning of gloves constitute a distinguishing characteristic permitting a *Molineux* exception, as many burglars take these steps to avoid leaving fingerprints. Thus, the prosecutor's premise that "climbing over rooftops to get into apartments" (23–

24), or anything else about these crimes, constituted a unique M.O. was baseless.

This case is reminiscent of *Wright*, 121 A.D3d at 926-27, also a burglary case in which the trial judge improperly allowed the People to introduce evidence that the defendant had committed or attempted to commit several other burglaries. The People asserted the existence of a unique M.O. because all of the offenses occurred in the City of Poughkeepsie and "'usually' involved two-story two-family houses." *Id.* That, this Court concluded, could "hardly be considered a distinctive mark so unique as to identify the defendant to the exclusion of others," and so the prejudicial nature of the prior crimes evidence required reversal. *Id.*

Similarly, in *Condon*, 26 N.Y.2d at 141, 144, where the defendant was accused of robbing a liquor store, the People sought to introduce evidence that he held up another liquor store a week later, using the same gun. The Court of Appeals held that the M.O. was insufficiently distinctive to qualify for this *Molineux* exception, even though the same gun was used in both robberies. *Id.* at 144. Stating that it could envision a crime that, by contrast, was "so unique that the mere proof that the defendant had committed a similar act would be highly probative of the fact that he had committed the one charged," it referred to "the identifiable characteristics of the crimes committed by the notorious

'Jack the Ripper'" as one such circumstance. *Id.* at 144.   *See also People v. Sanza*, 121 A.D.2d 89, 95-96 (1st Dept. 1986) (defendant had been convicted of raping and murdering a woman whose wedding ring was missing when her body was found; it was reversible error to introduce evidence of three rapes to which the defendant had pled guilty as there was "nothing remarkable or unique" about those other crimes).

As in *Wright* and *Condon*, there was nothing "unique" or "uncommon," *Sanza*, 121 A.D.2d at 96, about the other burglaries in which appellant was implicated.   This so-called M.O. – accessing an apartment building in the manner the prosecutor described – was no more unique or uncommon than stealing jewelry in the course of a rape, burglarizing a two-story, two-family home in a small town, or robbing a liquor store at gunpoint.   *See also People v. Stubbs,* 78 A.D. 3d 1665 (4th Dept. 2010) ("defendant's method of committing the prior crimes, i.e., traveling to a retail establishment as a passenger in a motor vehicle and threatening the cashier at that establishment with the use of a nonexistent gun, was not sufficiently unique to be probative on the issue of identity"); *People v. Pittman,* 49 A.D.3d 1166 (4th Dept. 2008) (reversing due to erroneous ruling allowing admission of evidence that defendant had shot at a police officer in the past, when he was on trial for shooting a police officer, because the M.O. was not unique and distinct); *People v. Buskey,* 45 A.D. 3d

21

1170 (3d Dept. 2007) (court committed reversible error when it permitted prosecutor to introduce evidence the defendant had touched and kissed teenage girls where he was charged with acts related to advances toward another teenage girl). *Cf. People v. Littlejohn*, 112 A.D.3d 67, 75 (2d Dept. 2013) (both crimes featured attacks on young, unaccompanied women in the early morning hours, the defendant held himself out as a member of law enforcement to facilitate commission of the crimes, bound the victims' hands behind their backs, transported them in a vehicle, sexually assaulted them in numerous ways; court noted that "significantly" both had large amounts of tape wrapped around their heads and over their faces"); *People v. Toland*, 284 A.D.2d 798, 804 (3d Dept. 2001) (defendant used shoelaces and socks to tie up women, and targeted women with strikingly similar physical characteristics); *People v. Balazs*, 258 A.D.2d 658 (2d Dept. 1990) (perpetrator posed as a pizza deliveryman and used silver-colored duct tape to immobilize the victims).

Not only was the purportedly unique methodology in this case not unique at all, but there was an important difference between this case and the other two. While this case involved a sexual assault, no such conduct was alleged in the December 25 and March 2 incidents. That rendered this crime critically different, and further undermined the prosecutor's *Molineux* application. *See Sanza*, 121 A.D.2d at 95-96 (in deeming the crimes insufficiently similar to

22

establish a pattern or M.O., noting that rape victim in present case had been strangled to death, while defendant's prior three rapes had been committed at gunpoint, and he had taken jewelry from only some of them). *Cf. Littlejohn*, 112 A.D.3d at 75 (that both victims had been sexually assaulted was a factor favoring admission of the prior crime).

The prosecutor undercut his own claim that the three crimes shared a trait so peculiar that they definitively pointed to a common perpetrator when he stated that the burglaries were "similar to what Brower boys [*sic*] were doing with the burglaries and Crown Heights" (16).   With this argument, the prosecutor allowed that he was proffering an M.O. for the gang, not appellant specifically.   That, in fact, directly cut <u>against</u> the prosecutor's claim that appellant's uncontested involvement in the December 25 and March 2 burglaries tended to prove his guilt of the crime charged, since at best it pointed to the Brower Boys as an entity, not appellant as an individual.   *See generally People v. DiPippo*, 27 N.Y.3d 127, 138 (2016) ("[M.O.] must be sufficiently unique to make the evidence of the uncharged crimes probative of the fact that <u>the individual</u> committed the one charged"; internal citations and quotation marks omitted) (emphasis added).   In sum, the prosecutor failed to establish a distinctive M.O., and the court erred when it found that *Molineux* exception applicable to this case.

23

\* \* \*

The error could not have been harmless, because the issue in this case was identity, and the *Molineux* material was used for that very purpose. Importantly, the complainants were unable to identify appellant. And, none of the other evidence, apart from the self-serving testimony of an accomplice in return for an exceedingly favorable prison sentence, and the improperly admitted DNA evidence (Point II, *Post*), placed appellant at the scene of the incident and definitively rebutted his alibi and his own testimony that he was not present. Defense counsel amply preserved the issue by objecting to its admission for precisely the reasons given here. The court further preserved this claim when it ruled that the evidence fell under the *Molineux* M.O. exception. Under these circumstances, we urge the Court to reverse appellant's conviction and order a new trial.

## POINT II

APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHEN THE PEOPLE SUBMITTED DNA EVIDENCE – CRITICAL PROOF AGAINST HIM AT TRIAL – THROUGH A WITNESS WHO DID NOT CONDUCT THE DNA TESTING AND MERELY ECHOED THE CONCLUSIONS REACHED BY ANOTHER CRIMINALIST.

The People introduced DNA evidence connecting appellant to a burglary and sexual assault through the testimony of a witness who did not personally conduct the DNA testing or analysis, or observe or supervise it. Instead, this witness merely reviewed the report encapsulating the results of tests conducted by other analysts, and conveyed those conclusions at trial. Because "surrogate testimony" by an expert witness was insufficient to satisfy the Confrontation Clause, appellant's convictions should be reversed and a new trial ordered. U.S. Const., Amend. XIV; N.Y. Const., Art. I, §6; *People v. Austin*, 30 N.Y.3d 98, 104 (2017); *People v. John*, 27 N.Y.3d 294 (2016); *see also Bullcoming v. New Mexico*, 564 U.S. 637 (2011); *Crawford v. Washington*, 541 U.S. 36 (2004).

The Confrontation Clause protects a defendant from "testimonial" evidence untested by cross-examination. *Crawford*, 541 U.S. at 49-55, 68.

Statements are testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52. When a statement's "primary purpose" is to establish a fact for use in a criminal proceeding, it is testimonial. *Davis v. Washington*, 547 U.S. 813, 822 (2006).

In *John*, 27 N.Y.3d 294, the Court of Appeals determined that a criminal defendant's right to confrontation is violated when the People introduce DNA implicating him in a crime without producing a witness who conducted, watched, or supervised the lab's generation of the DNA profile from the evidence or the defendant's exemplar. At a minimum, the People must produce the analysts involved in the final stage of DNA testing so that they are available for cross-examination at trial. 27 N.Y.3d at 313. In this final stage, analysts use an "electrophoresis instrument and a sophisticated software program" to generate "an electropherogram which is also known as a DNA profile," and then remove non-DNA related "artifacts," represented by peaks, from the electropherogram by engaging in an editing process that requires their skills and judgment. *Id.* at 298, 300, 302, 313-14.

When those analysts are unavailable, a qualified OCME expert may replace them, after conducting an independent review of the "computer imaging" that generated the DNA results and "recording their separate and

distinct evaluation." *Id.* at 313-14. As the Court also put it, the prosecution must, therefore, call either "an analyst who witnessed, performed, or supervised the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify." *John*, 27 N.Y.3d at 315. The analyst in *John* based her testimony "solely on the reports of the non-testifying analysts that were admitted into evidence" and not "on a separate, independent and unbiased analysis of the raw data." *Id.* at 310-11. Because she did nothing more than "export[]" "the two identical number sequences into a chart so that the jury could easily see the numbers were identical," the defendant's confrontation rights had been violated. *Id.* at 310-11.

In *John*, the Court deemed testimonial the lab reports of exemplars developed from a gun the defendant was accused of unlawfully possessing, since there was a criminal action pending against the defendant at the time it was tested. *John*, 27 N.Y.3d at 327 ("the primary (truly the sole) purpose [of the DNA test] was proving a particular fact in a criminal proceeding – that defendant was guilty of possessing it").

Here, the DNA evidence from the Adidas pants introduced through criminalist Robert Hindel's testimony was incontrovertibly testimonial, as its purpose was to connect appellant, who, as in *John*, was already accused, to the

others," typically not in his presence, that Mokleby had collected the information and wrote the report, and that he had merely reviewed that report (156, 176-78).

The information elicited during this exchange, along with the related documents, demonstrated that Hindel did not conduct or supervise any of the steps of the DNA testing itself, review the raw data, or write the resulting report (175-78), but rather parroted Mokleby's determinations (178). This characterization was confirmed by the exhibits pertaining to the DNA testing of the Adidas pants and appellant's buccal swab sample, as they bear Mokleby's initials ("LMO") and her signature, while Hindel's are nowhere to be found (Peo. Ex. 14). Indeed, Hindel even conceded that the results he was viewing could be "skew[ed]" or "affect[ed]" if an analyst made a mistake during the various steps of testing (175-76), verifying the wisdom underlying the *John* decision.

Thus, this case is distinguishable from *Brown*, 13 N.Y.3d at 340, which the trial court incorrectly found controlling (185-87). In *Brown*, the *John* majority explained, the testifying expert personally "supervised the generation of the DNA profile from the defendant's exemplar," examined and independently interpreted the "computer imaging from the software" that generated the DNA profile, and "determinatively [] testified that any

conclusions she reached from the raw data . . . <u>were her own and were not contained in any reports.</u>" *John*, 27 N.Y.3d at 310 (emphasis added). As Hindel's responses to defense counsel's and the court's questions confirmed, Hindel did no such thing, since he merely conveyed the findings from Mokleby's report. He was, therefore, not the appropriate witness through whom to present this critical evidence. *See John*, 27 N.Y.3d at 309 (witness's testimony violated defendant's right to Confrontation, because she "parrott[ed] the recorded findings that were derived from the critical witnesses' subjective analyses"); *see also Austin*, 30 N.Y.3d at 104. Because Hindel's testimony was insufficient to satisfy the Confrontation Clause, the "critical analysts who engaged in an independent and qualitative analysis of the data during the DNA typing tests . . . were effectively insulated from cross-examination." *John*, 27 N.Y.3d at 309; *see also Austin*, 30 N.Y.3d at 104. Accordingly, appellant's conviction should be reversed and a new trial ordered. *See Austin*, 30 N.Y.3d at 104; *John*, 27 N.Y.3d at 309.

\* \* \*

This constitutional error was not harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 25-26 (1967); *People v. Crimmins*, 36 N.Y.2d 230 (1975). Importantly, in this identification case, the complainants could not identify their assailants. Furthermore, as discussed in Point I, Scott's

29

testimony was self-serving and thereby suspect, and none of the additional evidence – appellant's vague and nonsensical Facebook posts and possession of property belonging to the complainants – put him at the scene of the incident. Accordingly, that the People used the DNA evidence to show that he had participated in the sexual assault of Daniels critically contributed to the verdict. *See Chapman* 386 U.S. at 25-26; *People v. Wright*, 25 N.Y.3d 769, 783 (2015) (when DNA evidence is introduced, the People's case may take on an "aura of invincibility" and "definitiveness" and "its mere introduction in a criminal case is sufficient to seriously impede defense challenges"; internal citations and quotation marks omitted).

The issue was amply preserved by defense counsel's repeated objections to Hindel's testimony and related exhibits on the grounds that they violated appellant's confrontation rights (182-84, 602, 606-07). Counsel specifically stated that he was entitled to cross-examine Mokleby, "the person who actually arrived at these opinions and conclusions, linking my client to DNA recovered from any of the seized property" (182-87, 619-20).

Defense counsel's statement that Hindel could testify about the raw data does not change the preservation analysis. On appeal, as in the court below, appellant's objection is not to the admission of raw data preceding any conclusion about it, but to Hindel's testimony conveying Mokleby's

30

interpretation of that data: that appellant's buccal swab sample matched the DNA on the Adidas pants. *See John*, 27 N.Y.3d at 315 ("an analyst who witnessed, performed or supervised the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify"). Indeed, *John* specifically explained that *Meekins*, which allowed admission of raw data, reached a different result in part for that very reason -- because *John* was about conclusions drawn from analysis of this raw data and not the raw data itself. *See John*, 27 N.Y.3d at 309-10; *Meekins*, 10 N.Y.3d at 159-60 (report non-testimonial when it contained "raw data" and no technician "compared the DNA profile they generated to defendant's"). The court further preserved the issue when it ruled that the evidence was admissible (185-87).

In sum, appellant's constitutional right to confront the witness who presented key evidence against him at trial was violated, defense counsel preserved this issue for appellate review, and the Court should reverse appellant's conviction and remand the case for a new trial.

## CONCLUSION

FOR THE REASONS STATED IN POINTS I AND
II, PETITIONER'S CONVICTIONS SHOULD BE
REVERSED AND A NEW TRIAL ORDERED.

Respectfully Submitted,

Derrin Dyson

Derrin Dyson 15A3359
Petitioner Pro-se
Five Points C.F.
P.O. Box 119
Romulus, N.Y. 14541

31

DERRIN DYSON

-against-

Title 28 U.S.C, §1746
CPLR §2106

BY U.S MAIL

matthew Thomas Super Intendent

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

APR 17 2020  ☆         -cv-_____ ( )

Defendants/respondents. ☆

of five points Correctional facility        x

BROOKLYN OFFICE

State of New York   )
County of Romulus   ) SS.:
Town of Seneca      )

I, ___Derrin Dyson_____, being ~~sworn~~ Declare under the penalty of

perjury, pursuant to Title 28 U.S.C. §1746, CPLR §2106, and Fed.R.Civ.P. 43(b),

state that on the 8 day of April_____, 2020, that I mailed the below

listed papers to the below listed parties via the U.S. Mail for service upon them

via the U.S. Postal Service.

PAPERS WERE: Writ of HABEAS CORPUS
                Documents you are serving

PARTIES WERE: (Name and address to whom sent)

1.) Eastern District court of New york   2.) Kings county District Attorneys
225 Cadman Square                            office. 350 Jay Street
Brooklyn, New york, 11201                 Brooklyn, New york, 11201-2908

3.) _____             4.) _____

_____            _____

_____            _____

Dated: April 8_____, 2020           Respectfully submitted

                                         _Derrin Dyson_
                                         Signature

              Address:  Five Points C.F
                        P.o.Box 119
                        Romulus, New York 14541

Derrin Dyson-15A3359
Five Points C.
State Route 96, P.O. Box 119
Romulus, New York, 14541

PRO SE OFFICE

RECEIVED
APR 23 2020

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   APR 23 2020   ★

BROOKLYN OFFICE

Eastern District Court
Eastern District of New York
225 Cadman Square
Brooklyn, New York, 11201

Correctional Facility




ZIP 1 45541
041M11227-2007